**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 24-274 (BAH) |
| DANIEL MELZINE KINGERY, | Judge Beryl A. Howell |
| Defendant. | |

## MEMORANDUM OPINION

Defendant-appellant Daniel Melzine Kingery appeals, pursuant to 18 U.S.C. §3402, his convictions and time-served sentences imposed for the guilty verdicts, issued by a magistrate judge following a bench trial, for several ticketed offenses arising from defendant's violation of 36 C.F.R. § 1.5(f) and 36 C.F.R. § 2.32(a)(1), (2), and one count of criminal contempt, in violation of 18 U.S.C. § 401(1). *See* Notice of Appeal, ECF No. 8. Upon consideration of defendant's Appeal of Magistrate Judge Decision ("Def.'s Br."), ECF No. 20, the government's response ("Gov't's Opp'n"), ECF No. 22, defendant's Reply ("Def.'s Reply"), ECF No. 23, defendant's Supplement to Reply ("Def.'s Supp."), ECF No. 24, and the entirety of the underlying record, for the reasons set forth below, defendant's convictions are **AFFIRMED**.

## I.    BACKGROUND

On February 15, 2023, the United States Park Police took steps to clear McPherson Square Park of an encampment. Trial Tr. (June 11, 2024) at 32, ECF No. 12. Most of the seventy or so individuals residing in the park left voluntarily, but defendant and one other individual declined to do so. *Id.* at 33-34. Park Police Lieutenant Matthew Cooney explained to defendant that remaining in the park was a violation of federal law and gave defendant multiple opportunities to leave voluntarily. Def.'s Br., Ex. 2 (Cooney Body Worn Camera footage

("Cooney BWC")) at 14:43:15-14:45:30, 15:15:30-15:17:00.  Lt. Cooney allowed defendant to

identify volunteers, who were able to collect his belongings for safekeeping.  *Id.* at 14:45:30-

14:48:15.  After his belongings had been removed from the park, defendant again declined to

leave and was arrested.  Defendant's interaction with Lt. Cooney was captured by Lt. Cooney's

body-worn camera.  Defendant's conduct prompted the issuance to him of three tickets for

various infractions, including for "violating a closure" of a public park, under 36 C.F.R. § 1.5(f);

for "intentionally interfering with a government employee or agent engaged in an official duty,"

under 36 C.F.R. § 2.32(a)(1), and for "[v]iolating the lawful order of a government employee or

agent authorized to maintain order," under 36 C.F.R. § 2.32(a)(2).  These citations are Class B

misdemeanors carrying a maximum penalty of six months imprisonment.  18 U.S.C. §§ 1865(a),

3559(a)(7).  Each ticket indicated that defendant did not have the option of simply paying a fine

but instead required that he appear in court.  Def.'s Br., Ex. 1.

     A trial was scheduled for March 22, 2024, on the three federal citations issued to him on

February 15, 2023.  Crim. Compl., Statement of Facts at 1, ECF No. 1-1.  On the scheduled trial

date, Magistrate Judge Moxila A. Upadhyaya attempted to conduct a bench trial to resolve these

tickets, with the prosecution appearing over Zoom and defendant proceeding *pro se* by

telephone.[1]  When the Magistrate Judge attempted to ascertain whether defendant consented to

proceed with this hybrid proceeding, Def.'s Br., Ex. 3 ("Mar. 22 Hr'g"), at 1:30-1:45, defendant

instead objected at length to his criminal charges being heard without a jury, *id.* at 1:45-4:00,

9:36-11:50.  Following his lengthy digressions expounding his personal views on constitutional

law, the illegitimacy of precedent, and his right to trial by jury, discussed in more detail below,

---

[1]    Generally, "the defendant must be present at . . . every trial stage," Fed. R. Crim. P. 43(a)(2), but the defendant's presence is not required when "[t]he offense is punishable by fine or by imprisonment for not more than one year, or both, and with the defendant's written consent, the court permits . . . trial . . . to occur by video teleconferencing," Fed. R. Crim. P. 43(b)(2).

*see infra* III.C, defendant disconnected from the call, Mar. 22 Hr'g at 12:00.  The Magistrate

Judge found that "[defendant] was summoned to be here on his misdemeanor trial.  He was on

the line for a short period of time and then hung up on the court.  Because he did so, I am going

to be holding him in contempt, and I will be issuing a bench warrant for his arrest."  *Id.* at 15:50-

16:20.

On March 25, 2024, Lt. Cooney filed a criminal complaint alleging that defendant had

committed contempt of court, under 18 U.S.C. § 401(1), *see* Crim. Compl., and an arrest warrant

for defendant was issued the same day, Arrest Warrant, ECF No. 3.

The arrest warrant was executed with defendant's arrest on May 23, 2024.  That day, at

his initial appearance, defendant explained to a different magistrate judge that his decision to

proceed *pro se* was because his assigned federal public defender had not been "competent

enough to prosecute the judge, upon whom I was supposed to have hung up on, for the act of

treason of denying me a jury trial for a criminal prosecution, which Amendment Six requires."

Def.'s Br., Ex. 4 ("Initial Appearance") at 4:8-11.  The magistrate judge ordered defendant held

pending a detention hearing, *id.* at 21:24-22:3, prompting defendant's objection that appearing

again in court "will require me to subject myself to an unconstitutional screening for weapons

and such to enter the court, and that violates Amendment Two, and I will resist that as well," *id.*

at 23:1-3.  Defendant also expressed concern that the same magistrate judge from whose call he

disconnected would preside over his contempt charge, maintaining that "it's a conflict of interest

for the person who accuses somebody of a crime to actually be the judge that hears it and then

convicts."  *Id.* at 24:9-11.  The presiding magistrate judge informed defendant of the usual

practice for objecting to a judge: "if it turns out it's her, you can come out and make whatever

objection you want to make, including the one you just made, that it would be a conflict to have

to try a case involving a contempt in front of her in front of her." *Id.* at 25:2-6.  Defendant acknowledged this advice, responding "I understand that that's generally the practice, because I have been held in contempt in various other courts as well," *id.* at 25:9-11, but stated his disagreement with this general practice because "it is a violation of an impartial judgment," *id.* at 25:16.

Two weeks later, on June 5, 2024, at a hearing before a third magistrate judge, defendant again expressed unease at the possibility that the original magistrate judge would hear his case, stating "[t]he judge with the contempt charge–and pardon me if I don't use names, saves confusion a little bit—would be a witness in that and should not be allowed to make any decision in that."  Hr'g Tr. (June 5, 2024) at 14:19-22, ECF No. 13.  The presiding magistrate judge advised defendant that "when it comes to recusal . . ., you'll have to go before that judge and make that point."  *Id.* at 14:24-25.

The next day, however, at a hearing, before Magistrate Judge Upadhyaya, defendant raised no objection to her deciding his criminal contempt charge.  *See generally* Hr'g Tr. (June 6, 2024), ECF No. 14.  Instead, he argued only that he was entitled to a jury trial for the purpose "get[ting] the unconstitutional laws that I am accused of violating removed from the books so they don't—so they don't keep being enforced and appearing in front of the courts, because according to Article VI, any law that is not made pursuant to the U.S. Constitution is not supposed to be enforced."  *Id.* at 12:9-14.  A trial date was set for the following week.  *Id.* at 19.  Later, the same day, the government filed an information formally charging defendant with "Misdemeanor Contempt," seeking penalties under 18 U.S.C. § 3559(a)(8), which carries a maximum penalty of thirty days of incarceration.  Information, ECF No. 6.  This matter was then

referred for all purposes to Magistrate Judge Upadhyaya, pursuant to 28 U.S.C. § 636(a) and 18 U.S.C. §3401.  Minute Order (June 6, 2024).

At the bench trial, on June 11, 2024, Magistrate Judge Upadhyaya decided to proceed with the contempt charge first, emphasizing that "the government has charged this as a Class C misdemeanor, which means it is a petty offense and which also means that there is no right to a trial by jury."  Trial Tr. at 6:20-23.  To support the contempt charge, the government presented the recording of the March 22, 2024, hearing, when the trial on the three tickets was originally scheduled. *Id.* at 9.  In defense, defendant argued he "ha[s] no contempt of the Constitution, which is the Court" but that he "do[es] have contempt in the highest degree of the actions of those who willfully violate the Constitution."  *Id.* at 13:8-11.  He furthered contended that the Constitution obliges that he tried by a jury.  *Id.* at 15-18.  Defendant raised no objection that the Magistrate Judge Upadhyaya should be disqualified.

Magistrate Judge Upadhyaya found defendant guilty of criminal contempt "by virtue of hanging up on the court in the middle of a day that was scheduled for trial for his proceeding." *Id.* at 18:21-24.  His standby council then recommended that "it may be best to sentence on the contempt instead of waiting until after the citation because we don't want the possible confusion that the sentence is for the citation where the Court and the government has expressed that there would be no jail sentence."  *Id.* at 19:25-20:5.  Defendant was sentenced on the contempt charge to time served, which amounted to the nineteen days that had passed since his arrest.  *Id.* at 23.

The magistrate judge then proceeded to the bench trial on defendant's three outstanding tickets.  Trial Tr. at 5, 23:16-17.  Lt. Cooney testified about the circumstances leading to defendant receiving the three tickets, explaining that the park had been closed due to "health and safety, sanitational reasons and criminal history within the park" caused by seventy individuals

living in it for eight months.  *Id.* at 33:1-2.  These "health and safety reasons" included "rodent infestation, personal sanitary conditions of various tents, including fecal matter, urine, drug paraphernalia as well as criminal activity which had been documented . . . [such as] criminal assault, threats and violence."  *Id.* at 46:18-24.  Lt. Cooney identified defendant was one of "the final two individuals in the park" and that defendant did not take the opportunity to leave voluntarily.  *Id.* 34-35.  Defendant's cross-examination of Lt. Cooney largely focused on the topic of the constitutionality of closing the park.  *Id.* at 40-45.

Defendant elected to testify in his own defense.  He recounted that the Park Police posted a notice about the closure six months before the closure and stated he interpreted this as saying, "to the homeless people, [that] you have six months where you can pitch your tent before we're going to kick you out."  *Id.* at 60:7-8.  He emphasized that the "Park Police has the authority to arrest people for litter . . . . [but] they have not done that once."  *Id.* at 60:12-15.  Furthermore, "D.C. Rodent Control was coming around once a week before the November posting[,] [b]ut after that, they quit cold turkey[, and] [r]ats multiply quickly."  *Id.* at 60:24-61:2.  In this way, "the arrest out of the park was my protest to draw attention to it, which I apparently have been failing miserably so far."  *Id.* at 61:11-13.  After consideration, the magistrate judge found defendant guilty of all three ticketed citations, in violation of 36 C.F.R. §§ 1.5(f), 2.32(a)(1), and 2.32(a)(2), and he was sentenced to time served.  *Id.* at 69, 73.  Defendant timely appealed.

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 58 sets out the procedures applicable "in petty offense and other misdemeanor cases and on appeal to a district judge in a case tried by a magistrate judge."  FED. R. CRIM. P. 58(a)(1).  Any appeal by a defendant of "a magistrate judge's judgment of conviction or sentence to a district judge" must be filed "within 14 days of

its entry." *Id.* 58(g)(2)(B).  On appeal, "[t]he defendant is not entitled to a trial de novo by a district judge[, and] [t]he scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge."  *Id.* 58(g)(2)(D).  The magistrate judge's legal conclusions are reviewed *de novo*, *see United States v. Young*, 107 F.3d 903, 910 (D.C. Cir. 1997), while the judge's factual findings on which a guilty verdict is based are accepted if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Williams*, 784 F.3d 798, 801 (D.C. Cir. 2015) (quoting *United States v. Andrews*, 532 F.3d 900, 903 n.1 (D.C. Cir. 2008)).

## III.    DISCUSSION

Defendant raises three challenges to his convictions.  First, he claims entitlement, under the Sixth Amendment to the U.S. Constitution, to a jury trial for both the tickets and his contempt convictions.  Second, he claims that the evidence was insufficient to convict for two of the three ticketed infractions.  Finally, he claims that Magistrate Judge Upadhyaya should not have presided over his criminal contempt charge and that his misconduct was not committed within the "presence" of the court as is necessary to sustain a criminal contempt conviction under 18 U.S.C. § 401(1).  These challenges are addressed *seriatim*, and none have merit.

### A.    Sixth Amendment Jury Trial Right

Defendant contends that because the Sixth Amendment provides that the right to "an impartial jury" extends to "all criminal prosecutions," he was entitled to trial by jury on all charges against him.  Def.'s Br. at 38.  Though recognizing that "[t]he Supreme Court first suggested in *Callan v. Wilson*, 127 U.S. 540 (1888), that the right to jury trial contained a 'petty-offense exception,'" Def.'s Br. at 34-35, and that "an offense is deemed 'petty' if the defendant is exposed to no more than six months imprisonment," *id.* at 35 (citing *Blanton v. City of N. Las

*Vegas*, 489 U.S. 538, 542 (1989)), he insists that the petty-offense exception is not compelled by the plain text of the Constitution, *id.*  In short, he contends that "[t]his case law, though binding, is wrong."  *Id.*  This challenge to defendant's convictions may be easily dispatched.

The government agrees with defendant that binding precedent makes clear that "the defendant was not entitled, by statute or by the Constitution as interpreted by the Supreme Court, to a trial by jury" for petty offenses.  Gov't Br. at 15-16 (citing *District of Columbia. v. Clawans*, 300 U.S. 617, 624 (1937) and *Cheff v. Schnackenberg*, 384 U.S. 373, 380 (1966) (plurality opinion)).  The Supreme Court has long held that defendants charged with petty offenses, including criminal contempt charges without severe penalties, are not entitled to trial by jury.  *See, e.g.*, *Callan*, 127 U.S. at 557 ("Except in that class or grade of offenses called petty offenses, which, according to the common law, may be proceeded against summarily in any tribunal legally constituted for that purpose, the guarantee of an impartial jury to the accused in a criminal prosecution, conducted either in the name, or by or under the authority of, the United States, secures to him the right to enjoy that mode of trial from the first moment, and in whatever court, he is put on trial for the offense charged."); *Frank v. United States*, 395 U.S. 147, 151 (1969) ("Penalties presently authorized by Congress for petty offenses, including a term on probation, may be imposed in federal criminal contempt cases without a jury trial.").

Defendant's disagreement with this binding precedent, no matter how principled, simply cannot succeed.  *See Hohn v. United States*, 524 U.S. 236, 252-53 (1998) (observing that Supreme Court's "decisions remain binding precedent until [it] see[s] fit to reconsider them.").

### B.    Sufficiency of the Evidence

Defendant next contends that "there is insufficient evidence to support either of [his] convictions under [36 C.F.R.] § 2.32(a)," though seemingly conceding the sufficiency of the

evidence to support his conviction under 36 C.F.R. § 1.5(f). Def.'s Br. at 30. "In reviewing a conviction for sufficiency of the evidence, [courts] must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational juror could have found the elements of the crime beyond a reasonable doubt." *United States v. Borda*, 848 F.3d 1044, 1053 (D.C. Cir. 2017).

Defendant was convicted of violating 36 C.F.R. § 2.32(a)(1), which prohibits "[t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty." As support for his challenge to the sufficiency of the evidence to support this conviction, defendant insists that he had not "intentionally interfered" with Lt. Cooney's operation because that "regulation is 'meant to prohibit conduct that is intended to interfere, not just conduct that creates an interference.'" Def.'s Br. at 30-31 (quoting *United States v. Buehler*, 793 F. Supp. 971, 975 (E.D. Wash. 1992)). According to defendant, a "mere failure to comply" with Lt. Cooney's command does not amount to interference but requires "active steps to prevent the park closure, say by removing the temporary fence erected at the entrance." *Id.* at 31. Furthermore, defendant explains, he was expressing his sincere belief that the Ninth Amendment prohibited his removal by Park Police. *Id.* at 32.

Defendant's reliance on the non-binding decision in *United States v. Buehler*, 793 F. Supp. 971, 975 (E.D. Wash. 1992), is not helpful to him here. The *Buehler* Court interpreted the phrase "intentional interfering" in 36 C.F.R. § 2.32(a)(1) to require specific intent and "[w]hen specific intent is an element of an offense, the fact a defendant reasonably believes he is not violating any law would be a defense." *Buehler*, 793 F. Supp. at 975. Here, defendant admits that he knew that his conduct was impermissible, testifying that his "intent with these actions is

to get it in front [of] a jury trial to prove that the actions of government are identical to those of 1776 that we've had many thousands of lives die for [sic] freedom." Trial Tr. at 60:20-23.[2] Consequently, by his own admission, defendant meets the definition provided in *Buehler* for liability under this regulation.

As the government correctly argues, the trial evidence establishes that defendant's refusal to leave the park delayed the park's closing and the Park Service's ability to clean the park, and firmly supports "an intent to interfere with this effort." Gov't's Opp'n at 13-14. Indeed, Lt. Cooney testified that "'Park Service staff notified me that they could no longer continue their cleanup process until the final two individuals in the park'—one of whom was [defendant]— 'had vacated or removed their stuff.'" *Id.* at 13 (quoting Trial Tr. at 34:14-18). As the magistrate judge found, based on the video and testimony of Lt. Cooney, defendant "had been informed of the closure order" and that he had "declined to vacate the area and that he [had] resisted leaving the park." Trial Tr. at 68:1-4. The magistrate judge further found that the evidence showed that defendant "clearly intentionally interfered with Lieutenant Cooney's having carried out an official duty. That is the closure order of McPherson Square. And that also with respect to . . . [defendant]'s failure to vacate the park, he also refused to comply with a lawful order." *Id.* at 68:16-21. These factual findings by the magistrate judge are amply

---

[2] Defendant also cites two other non-binding decisions that are similarly unhelpful to him. Def.'s Br. at 31 (discussing *United States v. Thorpe*, 122 F.3d 1058, 1997 WL 434086 (2d Cir. 1997) (per curiam) (unpublished table decision) and *Wilson v. Kittoe*, 229 F. Supp. 2d 520, 528 (W.D. Va. 2002)). Not only is *Thorpe* not precedential in the Second Circuit but defendant makes a flawed logical leap in construing the finding "that refusing to comply and fleeing from an arresting officer amounted to interference," Def.'s Br. at 31 (citing *Thorpe*, 1997 WL 434086, at *2), to mean that "[m]erely failing to comply does not rise to this level," Def.'s Br. at 31, when that was certainly not the holding nor even addressed in *Thorpe*. Likewise, *Wilson v. Kittoe*, 229 F. Supp. 2d at 531, is inapposite. In that case the court held that a Virginia obstruction of justice statute did not apply to an attorney, who verbally criticized a police officer and offered representation to an individual whom the police officer was arresting, when the attorney was not otherwise interfering with the arrest. Here, in contrast, defendant's refusal to leave the park did physically and intentionally interfere with the closing of the park.

supported by the trial evidence and provide sufficient evidence to support defendant's conviction for violating 36 C.F.R. § 2.32(a)(1).

Defendant also challenges the sufficiency of the evidence to support his conviction for violating 36 C.F.R. § 2.32(a)(2), which prohibits, in pertinent part, "[v]iolating the lawful order of a government employee or agent authorized to maintain order and control public access and movement during . . . law enforcement actions, and emergency operations that involve a threat to public safety or park resources, or other activities where the control of public movement and activities is necessary to maintain order and public safety." While not disputing that Lt. Cooney qualifies as "a government employee or agent authorized to maintain order and control public access and movement," defendant argues that "there is no evidence to support that Lieutenant Cooney's 'order' was 'lawful.'" Def.'s Br. at 32. As support for this argument, defendant relies heavily on the out-of-circuit decision in *United States v. Goldin*, 311 F.3d 191 (3d Cir. 2002), which rejected a void-for-vagueness challenge to the "public movement" provision of a local regulation, which was applied to arrest defendants in that case for blocking a police van from reaching a protest held "in Independence National Historic Park on July 3, 1999, one of the busiest days of the year at the park." *Id.* at 194-95. The Third Circuit found that because "an order given under the 'public movement' provision may only be given if '*necessary* to maintain order and public safety' . . . . we hold that the Regulation is sufficiently clear and narrow that it 'does not encourage arbitrary and discriminatory enforcement.'" *Id.* at 196 (internal citations omitted). Defendant here contends that application of the regulation to him flunks his view of the Third Circuit's *Goldin* test because "there is no evidence that Lieutenant Cooney's order was '*necessary* to maintain order or public safety.'" Def.'s Br. at 33. Even assuming defendant's reading of *Goldin* test is correct, his argument fails because Lt. Cooney provided clear evidence

11

that "the park was ordered closed because of the public safety risks it posed—including persistent camping by over 70 people, a rodent infestation, unsanitary conditions, drug activity, and violence." Gov't's Opp'n at 14 (citing Trial Tr. at 46:15-24).

The trial evidence, again, firmly supports the magistrate judge's finding that the closure "order had been made by—at a higher level within the Park Police for a number of reasons, particularly public health reasons. The fact that there were also drug paraphernalia and other items, fecal matter, bottles of urine and that there were well documented conditions of the sort for several months leading to the closure order." Trial Tr. at 67:19-25. Additionally, based on testimony heard at trial and the footage from the body-worn camera, the magistrate judge found that defendant "was informed numerous times and given the opportunity to comply and that he refused and resisted the multiple orders and refused to leave on more than one occasion." *Id.* at 68:23-69:1. These findings are more than sufficient for a rationale jury to conclude, beyond a reasonable doubt, that clearing the park was necessary to preserve public safety and that defendant violated a lawful order.

Given the ample evidence supporting the magistrate judge's factual findings and conclusions as to defendant's guilt, defendant's convictions for violating 36 C.F.R. § 2.32(a)(1) and (2) are affirmed.

### C.    Challenges to the Contempt Proceedings

Defendant raises two final challenges to his contempt conviction, arguing, first, that he was not "present" at the time of the alleged contemptuous conduct, as required by 18 U.S.C. § 401(1), and, second, that Magistrate Judge Upadhyaya should not have presided over his contempt trial. Def.'s Br. at 21-29. Neither argument succeeds to disturb his contempt conviction.

"The power to punish for contempts is inherent in all courts; its existence is essential to . . . the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006) (quoting *Ex Parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1874)). "The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power." *Id.* "Whenever counsel or a defendant on trial or a witness oversteps the bounds of propriety and refuses to heed the admonitions of the court or to obey in the presence of the court a lawful order of the court, he commits an act of contempt." *Jones v. United States*, 151 F.2d 289, 290 (D.C. Cir. 1945). This authority is codified to provide federal courts with the discretionary "power to punish by fine or imprisonment, or both, . . . such contempt of [their] authority as . . . [m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice . . . ." 18 U.S.C. § 401(1). "Circuit courts interpreting this power have broadly stated" that the phrase, "obstruction of the administration of justice" in § 401(1) requires "some act that will interrupt the orderly process of the administration of justice, or thwart the judicial process." *United States v. Brock*, 94 F.4th 39, 53 (D.C. Cir. 2024) (quoting *United States v. Warlick*, 742 F.2d 113, 115-16 (4th Cir. 1984)). The obstruction must result in some sort of "delay, confusion, [or] the diversion of judicial resources." *United States v. McGainey*, 37 F.3d 682, 685 (D.C. Cir. 1994).

To prove criminal contempt, under 18 U.S.C. § 401(1), the government must establish beyond a reasonable doubt four elements: "misbehavior of a person, in or near to the presence of the court, which obstructs the administration of justice, and which is committed with the required degree of criminal intent." *McGainey*, 37 F.3d at 684. Here, defendant only challenges the

second element—whether his misbehavior occurred in or near the presence of the court—and whether Magistrate Judge Upadhyaya was the appropriate decider of fact for his contempt trial.

Defendant contends his criminal contempt conviction must be vacated because § 401(1) imposes a "geographic requirement" that was not met because "the allegedly contemptuous conduct occurred at a virtual teleconference hearing—far out of the court's presence," without any evidence presented "of either [defendant]'s or Magistrate Judge Upadhyaya's geographic location." Def.'s Br. at 26-27. As support for this reasoning, he relies on two decisions, but both cases are inapposite. *Id.* at 26-28 (citing *Nye v. United States*, 313 U.S. 33 (1941) and *Klein v. United States*, 151 F.2d 286 (D.C. Cir. 1945) (per curiam)). In *Nye*, the Supreme Court reversed criminal contempt convictions against individuals who induced "through the use of liquor and persuasion" the administrator of an estate to terminate a legal action, reasoning that "[t]hese events took place more than 100 miles from . . . where the District Court was located" and that the words of the contempt statute "so near thereto" "are to be construed as geographical terms." 313 U.S. at 39-40, 48. A few years later, relying on *Nye*, the D.C. Circuit in *Klein*, likewise reversed a criminal contempt conviction against a lawyer who, during a five-day recess in a trial, "wilfully and abruptly abandoned and deserted his client" and "continue[d] to refuse to appear in said court," because, due to the recess, the lawyer's absence did not "occur[] in the presence of the court." 151 F.2d at 287-88.

The government correctly points out the obvious factual distinction in *Nye* and *Klein* that renders these cases inapplicable here. "In both cases, the court considered conduct that occurred outside a courtroom and out of view or hearing of the judge," so "[t]he line *Nye* and *Klein* drew, over 70 years before Zoom hearings became ubiquitous, was that 'presence' before the court required physical proximity to the courtroom," but "in the age of virtual hearings, 'presence'

before the court has a broader scope."  Gov't Opp'n at 12.  The government furthers notes that "Judge Upadhyaya had the authority and the duty to maintain order in the virtual courtroom in the same way she would in a physical courtroom."  *Id.*

The government is correct because the "geographic requirement" advanced by defendant has been outmoded not only by technological advancement but also by refinements to jurisprudence in the intervening years.  Decades after the Supreme Court's decision in *Nye*, it clarified the contours of the contempt doctrine, recounting that "[t]he distinction between in-court and out-of-court contempts has been drawn not to define when a court has or has not the authority to initiate for contempt, but for the purpose of prescribing what procedures must attend the exercise of that authority."  *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798 (1987).  By the end of the nineteenth century "a distinction had been carefully drawn between contempts occurring within the view of the court, for which a hearing and formal presentation of evidence were dispensed with, and all other contempts where more normal adversary procedures were required."  *Id.* (quoting *Bloom v. Illinois*, 391 U.S. 194, 204 (1968)). The Supreme Court observed that, "Congress also has regulated the manner in which courts exercise their power to prosecute contempts, narrowing the class of contempts subject to summary punishment," *id.* at 799 (citing Act of Mar. 2, 1831, ch. 99, 4 Stat. 487, 487-88), referring to the federal statute "now codified in 18 U.S.C. § 401," *United States v. Barnett*, 376 U.S. 681, 687 (1964).

Such a distinction makes sense.  As the Ninth Circuit explained "[d]irect contempt is misbehavior having the effect of interfering with the orderly conduct of a trial occurring 'under [the court's] own eye and within its hearing,'" whereas "[i]ndirect contempt is contumacious behavior occurring beyond the eye or hearing of the court and for knowledge of which the court

must depend upon the testimony of third parties or the confession of the contemnor." *United States v. Marshall*, 451 F.2d 372, 373 (9th Cir. 1971) (per curiam) (quoting *Ex parte Terry*, 128 U.S. 289, 310 (1888)).  Due to this distinction, "[b]oth contempt classifications under Fed. R. Crim. P. 42(a) and (b) require two separate procedures for trying and punishing contumacious behavior." *In re Heathcock*, 696 F.2d 1362, 1365 (11th Cir. 1983).  "Direct contempt provides for summary disposition; indirect contempt requires notice and hearing." *Id.*

In short, because defendant's behavior occurred in the view of the court and no further evidence was required to establish the contempt charge, consistent with the distinction drawn by the Supreme Court, defendant was in the court's "presence" within the meaning of 18 U.S.C. § 401(1).

Next, defendant contends that Magistrate Judge Upadhyaya should not have presided over his contempt hearing, Def.'s Br. at 21-25, citing the instruction in Federal Rule of Criminal Procedure 42 that "[i]f the criminal contempt involves disrespect towards or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents," FED. R. CRIM. P. 42(a)(3).  Defendant interprets this to mean that "Magistrate Judge Upadhyaya could have sought to hold [defendant] summarily in contempt, but because [defendant]'s prosecution proceeded via notice and hearing, she was disqualified from presiding over [defendant]'s contempt trial." Def.'s Br. at 21.  Defendant marshals authority for the general proposition that "where conditions do not name it impracticable, or where the delay may not injure public or private right, a judge, called upon to act in a case of contempt by personal attack upon him may, without flinching from his duty, properly ask that one of his fellow judges take his place." *Id.* at 22 (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)).  Notably, defendant tacitly acknowledges that Magistrate Judge Upadhyaya displayed no outward

16

prejudicial feelings towards him. *Id.* at 23; Def.'s Reply at 6. Nevertheless, he asserts that "[o]nce a judge has been personally attacked in such a manner that a judge of ordinary sensibilities might naturally be expected to harbor marked personal feelings against the attacker, *the law must assume that such feelings exist*, even though the judge, through admirable forbearance, gives no outward indication that he has been personally affected." Def.'s Br. at 23 (quoting *United States v. Meyer*, 462 F.2d 827, 839 (D.C. Cir. 1972) (emphasis in original)).

The government contends at the outset that defendant has waived this argument, which therefore should not be considered on appeal. Gov't Opp'n at 8. Although defendant expressed his concerns about appearing before Magistrate Judge Upadhyaya at his initial appearance and at his first appearance for the preliminary hearing, the government reasons that he made no "motion before the trial court for Judge Upadhyaya's recusal and because his attorney appeared to consent to the referral of the case to her, he waived this argument and the Court should not consider it on appeal." *Id.* Given the complexities of defendant representing himself and the role of standby counsel and impact of that counsel's representations, the Court assumes that defendant neither waived this argument by his standby counsel's representations nor forfeited this argument by his own conduct in failing to raise it at trial.[3]

As to the merits of defendant's argument, Magistrate Judge Upadhyaya committed no error in presiding over the criminal contempt proceeding. Defendant's rhetoric did not amount to disrespect towards or criticism of the Magistrate Judge within the meaning of Rule 42(a)(3).

---

[3] The government's reliance on the affirmative representations to the magistrate judge by defendant's standby counsel as support for finding a waiver, raises some concern as to whether these representations conformed to the right to self-representation guaranteed by *Faretta v. California*, 422 U.S. 806 (1975). *See McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984) ("If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded." (emphasis original)).

According to defendant, portions of the virtual proceedings held on March 22, 2024,

when the bench trial was originally scheduled, show his disrespect towards or criticism of

Magistrate Judge Upadhyaya warranting her recusal from presiding over the contempt charge

bench trial.  Def.'s Br. at 24.  At one point in the proceedings, defendant accuses the Magistrate

Judge of violating the Constitution, being in the "perspective of treason," and violating her oath.

*Id.*[4]  The government properly characterizes defendant's comments, however, as "*not* 'personal

attacks' of such a nature that 'a judge of normal sensibilities might naturally be expected to

harbor marked personal feelings against the attacker.'"  Gov't Br. at 10 (emphasis original)

(quoting *Meyer*, 462 F.2d at 839).  In context, defendant used abrasive language to emphasize his

belief in the right to a jury trial, but this was actually done in a manner respectful to the presiding

judicial officer, referring to her as "Your Honor" and expressing how he "appreciates [her]

time."  Mar. 22 Hr'g at 9:36-11:50.  When he first began discussing treason during the virtual

hearing, for example, he stated:

> According to Amendment VI of the U.S. Constitution, the government is not
> allowed to hear any criminal prosecutions without a jury, and I have requested
> that.  Amendment VII does allow non-criminal prosecutions to be heard by a jury,
> no by a judge.  But since I do have a federal judge here, I've been instructed
> by . . . the federal statute on misprison on treason, and any violation against the
> U.S. Constitution is considered an act of treason either in levying war against the
> United States of America or in adhering to the enemies foreign or domestic.  If
> this court decides to go ahead with a judge trial instead of a jury trial, which I
> have specifically requested and Amendment VI demands, I would like to notify
> this Court that they are in direct violation of the U.S. Constitution Amendment
> VI, which puts them in a perspective of treason, Article III, Section 3, levying
> war, using political force against the standards.

---

[4]     Defendant explained his broad view of conduct constituting treason, later testifying: "[T]reason is
commonplace.  And unfortunately, they are so commonplace that we have just come to accept it.  I would like to
stop that and make us the United State of America that we are supposed to have been from 1776.  Other than that, I
don't mind spending the rest of my life  in prison for my confession in open court for my treason."  Trial Tr. at
63:10-17.

*Id.* at 2:50-4:00.  Following the Magistrate Judge's explanation as to why he was not entitled to a

jury trial, defendant continued:

> If I may ask for a clarification, one of your last statements, your Honor, was that
> those restrictions or prohibitions against Amendment VI, right to a jury trial, you
> referenced the Constitution.  I have read the Constitution several times, and I have
> not found anywhere in the U.S. Constitution where Amendment VI, or the content
> of Amendment VI, has been altered.  And by definition, in all criminal
> prosecutions, the accused shall enjoy the right to a speedy public trial by an
> impartial jury. . .  And this is a criminal prosecution.  I will refuse to submit to
> any judge trial when Amendment VI demands a jury trial.  The federal
> legislatures do not have any right to pass any law that says otherwise.  The
> Constitution does not recognize that.  Any act contrary to Amendment VI by a
> judge having any say in a jury trial is an act of treason, Article III, Section 3.
>
> I do appreciate your time, and I realize that I may be held in contempt of court,
> but I am not subjecting myself to any act of government that violates the U.S.
> Constitution, unless the government can prove that your actions are in accord with
> Amendment VI in this criminal prosecution.  I would be more than happy to, but
> you have not done so. . . . I have demanded once again that jury trial.  I am more
> than willing to proceed with a jury trial but not by a judge trial.  It is a destruction
> of the U.S. Constitution that you and the lawyers swore an oath to.

*Id.* 9:36-11:50.  He then disconnected from the proceedings.

In these statements, save disconnecting from the proceedings, defendant advances his

legal position that a bench trial in any kind of criminal case is invalid and violative of the

Constitution.  None of his comments allege bias, prejudice, or any impropriety personal to the

presiding Magistrate Judge but express his views of the legal system and the precedents that

deny trial by jury for petty offenses.  Nor do these comments amount to, for instance, "a[n]

outburst of foul language directed at the court" that the D.C. Circuit has previously held to be an

"intolerable misbehavior in the courtroom [that] falls within the prohibition of section 401(1) and

Federal Rule of Criminal Procedure 42(b)."  *In re Sealed Case*, 627 F.3d 1235, 1238 (D.C. Cir.

2010).

Defendant's comments were demonstrably not isolated or personal to Magistrate Judge

Upadhyaya: he communicated similar sentiments with similar rhetoric in his interactions not

only with Lt. Cooney in the park, *see, e.g.*, Cooney BWC at 14:44:45-14:45:23 (when Lt. Cooney attempted to explain the legal authority for the park closure and declined to engage in a debate over constitutional law, defendant responded: "Article VI demands that every law be made pursuant to the U.S. Constitution. . . . I'm letting you know that that law was made in violation of the U.S. Constitution. . . . [B]ecause you took an oath to the U.S. Constitution, this is the time to discuss it."), but also in other hearings presided over by other magistrate judges, *see, e.g.*, Hr'g Tr. (June 5, 2024) at 18:2-5 (defendant stating that "to exclude minor crimes from that jury trial is . . . an act of treason against the Constitution, rebellion or insurrection by violating that Constitution."); *id.* at 20:18-21:4 (defendant referring "to the oath that judges are under to the Constitution . . . . And if they are not allowed to use that Constitution in their decisions, without having to refer it off to the U.S. Supreme Court to make their decisions for them because that would, in my opinion, would indicate an incompetence . . . ."); Hr'g Tr. (June 6, 2024) at 14:23, 15:20-16:2 (defendant describing his view that systemic failures perpetuate "the tyranny and tyrant" rejected by the Declaration of Independence and that, "[i]t is clear that the government branches, all levels and all branches, are scratching each other's back, legislators pass unconstitutional laws, police officers enforce them, judges only want to know whether or not the person did as the officer has accused them."); Initial Appearance at 11:10-13 (defendant asking, "I would have to ask the prosecutor if the prosecutor will prosecute a governmental official for treason if I can prove to you that they are in fact guilty of treason, will you prosecute.").

As the First Circuit observed, and the D.C. Circuit endorsed as "vivid but accurate," "[o]ne must appreciate that courtrooms, especially in criminal cases, are theaters of extreme emotion—stoked by the facts of the alleged crimes, the tensions of striving lawyers and hostile

cross examination, and the fearsome stakes.  Every trial judge knows how easy it is for matters to get out of hand."  *In re Sealed Case*, 627 F.3d at 1238 (quoting *United States v. Browne*, 318 F.3d 261, 266 (1st Cir. 2003)).  Here, Magistrate Judge Upadhyaya conducted the beginnings of the bench trial on March 22, 2024, with the *pro se* defendant, who has sincerely held views on the Constitution that he expresses with "extreme emotion," but his expression of such emotion, does not amount to "disrespect toward or criticism of" the Magistrate Judge.  FED. R. CRIM. P. 42(a)(3).  His contemptuous act was disconnecting his telephone to stop participating in the proceedings, not anything he said.

Magistrate Judge Upadhyaya took none of defendant's comments personally but treated defendant throughout the beginning of the bench trial on March 22 and completion of the bench trial on June 11, 2024, with both patience and respect.  She summarized her view that, "I do believe that [defendant] is acting pursuant to his beliefs under the Constitution, what he believes the Constitution entitles him to which as I have noted is contrary to well settled law that's binding on this Court.  And that by hanging up on the Court, that was a disruption and that did meet the elements of 18 USC [§] 401."  Trial Tr. at 23:4-9.  In other words, only the act of hanging up during the March 22, 2024 proceeding formed the basis for the criminal contempt charge.[5]  This act, though contemptuous of the Court and disruptive of the proceeding, does not amount to "disrespect towards or criticism of a judge" within the meaning of Rule 42(a)(3).  Therefore, Magistrate Judge Upadhyaya appropriately moved forward to adjudicate the contempt charge.

---

[5]    Lest there be any doubt, at trial, the government summarized the conduct for which it believed supported contempt without reference at all to defendant's arguments: "Your Honor, based on [defendant]'s action in hanging up on the Court in the middle of an ongoing proceeding, we believe he violated 18 U.S. Code, Section 401, Subsection 1, I believe it is by interfering with the proceeding.  And in fact, if you listen to the rest of the tape, you did come back and make a finding that he was in contempt at that time."  Trial Tr. at 9:5-11.

## IV.     CONCLUSION

For the foregoing reasons, defendant has not demonstrated any error relating to his criminal trial and his convictions are affirmed.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: December 9, 2025

_____
**BERYL A. HOWELL**
United States District Judge